WENDY H. POOLE, Plaintiff v. COPLAND, INC. and JOHN HAYNES, Defendants

No. COA95-693

(Filed 4 February 1997)

**1. Intentional Infliction of Mental Distress § 2.1 (NCI4th)— expert testimony—causation of emotional distress—use of could and might**

Testimony by plaintiff's experts that alleged harassment "could" or "might" have triggered plaintiff's severe emotional distress was sufficient to show that the harassment caused the emotional distress where additional evidence presented by plaintiff supported the experts' testimony.

**Am Jur 2d, Expert and Opinion Evidence § 129.**

**2. Intentional Infliction of Mental Distress § 3.2 (NCI4th)— thin skull rule—application to mental injury case—exacerbation of preexisting mental condition**

The "thin skull" rule can be applied to mental as well as physical injury cases; therefore, a defendant may be liable in an action for the intentional infliction of emotional distress for aggravation or exacerbation of a preexisting mental condition, and the trial court did not err by giving an instruction defining severe emotional distress as including exacerbation of a preexisting dissociative disorder.

**Am Jur 2d, Fright, Shock, and Mental Disturbance §§ 25, 27; Negligence § 500.**

**3. Intentional Infliction of Mental Distress § 3.2 (NCI4th)— exacerbation of dissociative disorder—peculiar susceptibility**

Where the trial court instructed the jury in an action for the intentional infliction of emotional distress by sexual harassment that severe emotional distress includes exacerbation of a preexisting dissociative disorder, the court should also have given a peculiar susceptibility proximate cause instruction on the issue of liability requiring the jury to find that the alleged sexual harassment could reasonably be expected to injure a person of ordinary mental condition.

**Am Jur 2d, Damages § 281; Fright Shock, and Mental Disturbance § 27.**

POOLE v. COPLAND, INC.

[125 N.C. App. 235 (1997)]

On-the-job sexual harrassment as violation of state civil rights law. 18 ALR4th 328.

4. **Intentional Infliction of Mental Distress § 3.1 (NCI4th)— sexual harassment—employee and employer—ratification and negligent retention—separate issues**

In an action for the intentional infliction of emotional distress by sexual harassment at work, the trial court did not err by submitting separate damages issues to the jury as to defendant employee and defendant employer where plaintiff sought recovery against the employer under theories of independent negligence in retaining the harassing employee and of vicarious liability for ratifying the employee's tortious conduct. However, the trial court should also have submitted separate damages issues for ratification and negligent retention because plaintiff's recovery under the theory of ratification was limited to the amount of damages awarded against the employee, while plaintiff could recover all damages she could prove were proximately caused by the employer's negligent retention of the employee.

Am Jur 2d, Employment Relationship §§ 469, 476.

Employer's knowledge of employee's past criminal record as affecting liability for employee's tortious conduct. 48 ALR3d 359.

On-the-job sexual harassment as violation of state civil rights law. 18 ALR4th 328.

Liability of employer, supervisor, or manager for intentionally or recklessly causing employee emotional distress. 52 ALR4th 853.

Appeal by defendant Copland, Inc. from judgment entered 16 November 1994 by Judge Orlando F. Hudson in Alamance County Superior Court. Heard in the Court of Appeals 13 May 1996.

Plaintiff Wendy Poole brought this action alleging negligent infliction of emotional distress by defendant John Haynes, a coworker, and ratification of Haynes' conduct and negligent retention and supervision by their employer, defendant Copland, Inc.

Ms. Poole, then twenty-three years old, began work at Copland, Inc. (Copland) in November 1989. According to the trial testimony of

POOLE v. COPLAND, INC.

[125 N.C. App. 235 (1997)]

Ms. Poole, she met defendant Haynes during her first week on the job and they had a conversation regarding Camaro automobiles versus Mustangs. Haynes commented that Ms. Poole "looked like the type of person that needed somebody to go up inside of [her] about two car lengths deep." Ms. Poole testified she was "kind of in shock" and told Haynes he "[didn't] need to be talking like [that]" in front of her. She asked a coworker if Haynes talked that way in front of everyone, and the coworker replied: "Yeah, we've just got immune to it." Poole reported the incident to her supervisor, Bill White.

Ms. Poole testified to numerous other similar incidents, including an occasion when Haynes asked Ms. Poole if she was happily married and whether she had "had a man lately." Haynes told her: "You haven't had a man until you've had me . . . I've got twelve inches hanging." Another time, Ms. Poole turned around to find Haynes standing behind her with his pants unzipped. She asked Haynes what he was doing, and he replied: "Well, I was going to show you what a real man felt like . . . ." Later, Haynes told her that once she "had" him, she would never go back to her husband. She testified he told her that her husband, Kevin, "had better hold tight to me at night because [Haynes] would slide in right beside of Kevin and f--- my eyes out and make Kevin like it." Ms. Poole reported these incidents to Bill White, but he told her that Haynes "was just a youngun', to ignore him," and that Haynes "was only picking."

Haynes asked Ms. Poole if she was a natural redhead and said: "There's not but one way for me to find out that you're a true redhead . . . I just need to see your p---y hair." Haynes asked Ms. Poole if she gave "blow jobs." On another occasion, Ms. Poole and several others were in Bill White's office when Haynes grabbed his crotch and asked her: "[H]ave you made up your mind whether or not you want some of this or not?" Ms. Poole told White: "Bill, you see. You see I'm not lying. Why do you let this go on?" According to Poole, White laughed, telling her to let it go, and that Haynes was "just joking."

Ms. Poole testified the harassment continued throughout her employment at Copland. While working at Copland, she testified "I got to where I couldn't eat. I was throwing up green phlegm all the time. My bowels wouldn't move." She often came home from work crying, she had nightmares and trouble sleeping, she did not want to go to work in the mornings, and her relationship with her husband suffered.

POOLE v. COPLAND, INC.

[125 N.C. App. 235 (1997)]

Ms. Poole's employment at Copland ended 14 November 1990. The previous day, there had been a confrontation in Copland's parking lot between Haynes, Poole's husband, and another man. As the Pooles were leaving the parking lot, Haynes grabbed his crotch and made an obscene gesture at Ms. Poole. That night, the Pooles telephoned Melvin Butler, a manager at a plant operated by another division of Copland. Ms. Poole had telephoned Butler on an earlier occasion to complain about Haynes' conduct. In a partially tape-recorded conversation played for the jury, Ms. Poole reported Haynes' actions to Butler. The next day, in a meeting with Butler, Bill White, and Jim Copland, III, president of Copland, Haynes admitted grabbing his crotch the previous day and was terminated. After word spread that Haynes had been fired, Ms. Poole testified that other workers on the plant floor began cursing her, spitting at her, and throwing papers at her. Following a heated confrontation with Bill White, Ms. Poole contended she was fired.

Ms. Poole filed this action 16 September 1992. At trial, evidence was presented that prior to Ms. Poole's employment at Copland: 1) she had been sexually molested by a neighbor at age nine; 2) she had given birth to a child out-of-wedlock at age fifteen; 3) at age sixteen, she married her child's father, a physically abusive drug addict; 4) she was molested by an uncle at age eighteen; 5) also at age eighteen, she was brutally raped by her father's friend over a period of two weeks in which she was kept locked in a closet with her hands and feet taped and only taken out of the closet to be raped; 6) at age nineteen, she was beaten by her father with a cue stick, fracturing her arm in two places; and 7) she divorced her first husband at age twenty-one. Ms. Poole also presented testimony from three expert witnesses.

Kim Ragland, a psychologist at the mental health center who met with Ms. Poole, testified Ms. Poole told her she had been molested as a child and that the harassment at Copland brought all of the bad memories back, that she could not stop crying, and that she was having trouble with her marriage. On direct examination, Ms. Ragland was asked: "And do you have an opinion as to whether or not her experiences at Copland in terms of the harassment that she suffered there, do you have an opinion whether or not that would trigger bad feelings and memories of these things that occurred in her past?" Ms. Ragland replied: "I would think that it could." When asked if she thought a diagnosis of posttraumatic stress disorder would be possible based on the reported harassment at Copland, even if a person had no prior history of sexual abuse, Ms. Ragland testified: "I think

POOLE v. COPLAND, INC.

[125 N.C. App. 235 (1997)]

that it's possible, yes." Ms. Ragland was also asked: "So is your opinion that a person of ordinary sensibilities with no prior sexual history could be affected the same way by similar conduct?" She replied: "Yes." She also testified that sexual harassment in the workplace was a stressor which could trigger posttraumatic stress disorder, major depression, and exacerbate a preexisting disorder or depression.

Dr. Dianne Litaker, staff psychiatrist at the Alamance-Caswell Area Mental Health Center, testified she diagnosed Ms. Poole as suffering from posttraumatic stress disorder and major depression. Dr. Daniel Blake, a psychiatrist in private practice, testified he examined Ms. Poole in November 1993 and diagnosed her as suffering from dissociative disorder and posttraumatic stress disorder complicated by depression. During the redirect examination of Dr. Blake, the following exchange occurred:

Q. Will or would sexual harassment or could sexual harassment that is experienced by Mrs. Poole in her employment at Copland Fabrics—

A. Uh-huh.

Q. —have triggered the dissociative disorder and posttraumatic stress disorder that you have explained?

A. You're close to right. Now the—the dissociative disorder was almost certainly present since her childhood, but it was not manifest to where people around her would recognize it . . . .

Ms. Poole also presented medical expert testimony related to her suffering from irritable bowel syndrome, which Dr. Robert Elliot testified can be caused or aggravated by stress.

Defendants presented numerous coworkers of Ms. Poole and Haynes who testified they never witnessed any sexual harassment by Haynes and who contradicted the testimony of Ms. Poole regarding various incidents at work. The jury found Haynes liable for intentional infliction of emotional distress and awarded Ms. Poole $2,000 in actual damages and $5,000 in punitive damages against Haynes. The jury also found Copland liable for ratification of Haynes' conduct and negligent retention of Haynes, and awarded Ms. Poole $50,000 in actual damages and $250,000 in punitive damages from Copland. From this judgment, defendant Copland appeals. Defendant Haynes filed no appeal.

*Hunt and White, by Octavis White, and Daniel H. Monroe, for plaintiff-appellee.*

*Tuggle Duggins & Meschan, P.A., by J. Reed Johnston, Jr. and Denis E. Jacobson, and Schoch & Woodruff, L.L.P., by Arch K. Schoch, Jr., for defendant-appellant Copland, Inc.*

McGEE, Judge.

Copland argues the trial court erred by: 1) denying Copland's motions for a directed verdict and judgment notwithstanding the verdict based upon an alleged insufficiency of evidence of causation; 2) failing to properly instruct the jury on the issue of liability regarding intentional infliction of emotional distress; 3) improperly instructing the jury on causation; 4) instructing the jury twice on the issue of damages and submitting separate damages issues to the jury as to each defendant; and 5) denying Copeland's post-trial motions for a new trial or amendment of the judgment based upon an alleged improper and inconsistent verdict. Upon review of the record, briefs, transcript and exhibits, we agree the trial court erred in its instructions to the jury and hold Copland is entitled to a new trial. Because some of the other issues are likely to recur at trial, we also discuss them.

We first note Ms. Poole contends Copland has no standing to contest the issue of causation of Ms. Poole's injury by Haynes' conduct because Haynes did not appeal the decision against him. However, she cites no authority for this contention and we do not consider it. N.C.R. App. P. 28(b)(5).

In this case, plaintiff accused defendant Haynes in her complaint of negligent infliction of emotional distress. After presentation of the evidence at trial, the jury was instructed as to the issue of intentional infliction of emotional distress and this issue was submitted to the jury. Plaintiff also alleged defendant Copland ratified Haynes' actions and that Copland negligently retained and supervised Haynes. To establish a claim for intentional infliction of emotional distress, a plaintiff must prove: 1) extreme and outrageous conduct, 2) which is intended to cause and does cause, 3) severe emotional distress to another. *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). On appeal, Copland does not argue Ms. Poole failed to present sufficient evidence of extreme and outrageous conduct or severe emotional distress. Instead, Copland's arguments focus on the element of causation.

POOLE v. COPLAND, INC.

[125 N.C. App. 235 (1997)]

## I.

[1] Copland first argues the plaintiff presented insufficient evidence of causation to justify submission of the case to the jury, and therefore, the trial court should have granted Copland's motions for directed verdict and judgment notwithstanding the verdict. Copland contends the testimony of plaintiff's experts that the harassment alleged to have occurred "could have" or "might have" triggered Ms. Poole's severe emotional distress is insufficient to show the harassment caused the emotional distress, especially in light of the number of other factors in her life capable of causing severe emotional distress.

In ruling on a defendant's motion for a directed verdict, the trial court should deny the motion if the evidence, in the light most favorable to the non-moving party, provides more than a scintilla of competent evidence to support the plaintiff's *prima facie* case. *Brown v. Burlington Industries, Inc.*, 93 N.C. App. 431, 433-34, 378 S.E.2d 232, 233-34 (1989), *disc. review improvidently allowed*, 326 N.C. 356, 388 S.E.2d 769 (1990). The same standard is applied to motions for judgment notwithstanding the verdict. *Id.* at 434, 378 S.E.2d at 234. Here, we find plaintiff's evidence was sufficient to send the case to the jury.

Expert witness testimony regarding causation which is based on mere speculation or possibility is incompetent. *Ballenger v. Burris Industries*, 66 N.C. App. 556, 567, 311 S.E.2d 881, 887, *disc. review denied*, 310 N.C. 743, 315 S.E.2d 700 (1984). However, "could" or "might" may be used when the expert witness lacks certainty. 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence*, § 189 (4th ed. 1993). Whether "could" or "might" will be considered sufficient depends upon the general state of the evidence. *Id.* at § 189, n. 330; *Hinson v. National Starch & Chemical Corp.*, 99 N.C. App. 198, 202, 392 S.E.2d 657, 659 (1990).

Cases finding "could" or "might" expert testimony to be sufficient often share a common theme—additional evidence which tends to support the expert's testimony. *See, e.g., Mann v. Transportation Co. and Tillet v. Transportation Co.*, 283 N.C. 734, 198 S.E.2d 558 (1973) (expert's testimony that preexisting defect "could or might have" caused steering system to fail, along with testimony of driver and plaintiff that driver turned the wheel but bus would not turn, held sufficient to send case to the jury); *Lockwood v. McCaskill*, 262 N.C. 663, 138 S.E.2d 541 (1964) (expert psychiatric testimony that accident "may have had an influence" on plaintiff's condition not sufficient

standing alone, but when combined with expert's testimony on cross-examination and testimony of other lay witnesses, enough for jury to infer plaintiff's amnesia resulted from the accident); *Kennedy v. Martin Marietta Chemicals*, 34 N.C. App. 177, 237 S.E.2d 542 (1977) (expert testimony that inhaling of gases could have triggered decedent's heart attack, combined with evidence of color of decedent's lungs and quick breathing by decedent, held competent to support Industrial Commission's finding that a sudden deprivation of oxygen accelerated or aggravated decedent's preexisting heart condition). Cases finding "could" or "might" expert testimony insufficient generally have additional evidence or testimony showing the expert's opinion to be a guess or mere speculation. *See, e.g., Maharias v. Storage Company*, 257 N.C. 767, 127 S.E.2d 548 (1962) (expert's testimony that a pile of rags could have caused a fire through spontaneous combustion held insufficient when expert also testified on cross-examination that he did not know where the rags were before the fire and that the fire "could have happened from any one of a number of causes"); *Hinson v. National Starch & Chemical Corp.*, 99 N.C. App. 198, 392 S.E.2d 657 (1990) (expert's testimony that plaintiff's inhalation of a chemical could have caused her impairment held insufficient where expert also testified he could not relate plaintiff's impairment to any specific etiology and that he could not say yes or no whether plaintiff's decreased pulmonary function resulted from an inhaled chemical).

In this case, the record provides additional evidence supporting the testimony of plaintiff's experts that the harassment could have or might have caused the severe emotional distress. In discussing her emotional state both before and after beginning her employment at Copland, Ms. Poole testified:

> As you've already been told, I was molested when I was nine. I was brutally raped when I was eighteen years old. I married my little girl's father who was a drug addict and he beat me, and I never knew what happiness was until I married my husband now, Kevin, but I had blocked these out of my mind. It was like I had started over, turned over a new leaf. I didn't let this bother me, but due to the fact of being sexually harassed, gestures, and things [Haynes] would say, it was like a water wheel bringing up bad memories of being taped, . . . my mouth being binded [sic], and only being taken out of a closet to be raped for two weeks, two weeks straight. I had forgotten all about these things. I had pushed them in—just like pushing it under a rug. I had started

**POOLE v. COPLAND, INC.**

[125 N.C. App. 235 (1997)]

up—started a whole new life with my husband. We were going to church, doing great, and then every day I'd get up, cry having to go to work, cry coming home.

. . .

Before I went to work at Copland, me and my husband were like on a continuous honeymoon until I started being harassed and it brought back up memories of being raped, being molested. It got to where I couldn't be intimate with my husband for as much as three months at a time.

She also testified her husband had no knowledge of her being molested and raped until the problems at Copland began and he asked her to tell him what was happening with her. Ms. Poole's therapist, Kim Ragland, testified that according to Ms. Poole's medical records, Ms. Poole reported at the time she began receiving treatment that she "was doing fine prior to the sexual harassment," but "that basically she was reliving all of the things from the past because of [the harassment]." Dr. Dianne Litaker, staff psychiatrist at the Alamance-Caswell Area Mental Health Center, testified Ms. Poole reported the harassment triggered her problems and her symptoms began during the time she was being harassed on the job. Dr. Daniel Blake, a psychiatrist who saw Ms. Poole in November 1993, testified Ms. Poole told him her symptoms were triggered by what occurred during her employment at Copland and that "[i]t was Mrs. Poole's firm feeling that the sexual harassment over a period of months without being able to enforce reasonable boundaries led to her psychological stress . . . ." In light of this additional evidence, plaintiff's experts' testimony that the harassment could have or might have triggered Ms. Poole's severe emotional distress was sufficient on the issue of causation to take the case to the jury. Therefore, the trial court properly denied Copland's motions for directed verdict and judgment notwithstanding the verdict. This assignment of error is overruled.

II.

[2] Copland next argues the trial court erred in its instructions to the jury on the issue of liability for intentional infliction of emotional distress. The trial court first instructed the jury that in order to find defendants responsible for intentional infliction of emotional distress, they must find the presence of the three elements listed in *Dickens* and discussed above. The court further instructed on proxi-

mate cause and intent pursuant to the pattern jury instructions. The court then defined severe emotional distress as follows:

> Severe emotional distress means any type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so, including, but not limited to, posttraumatic stress disorder, exacerbation of a preexisting dissociative disorder, and major depression.

This instruction regarding the definition of severe emotional distress would allow recovery upon a finding that defendants' actions exacerbated a preexisting dissociative disorder. Copland contends this impermissibly allows recovery under a "thin skull plaintiff" theory, which Copland argues is not available in cases of intentional infliction of severe emotional distress. In the alternative, Copland argues the court should have given an instruction on peculiar susceptibility.

We disagree with Copland's contention that the thin skull rule applies only to physical injuries and does not apply to mental injury claims. We see no reason to treat mental injury any differently than physical injury. As our Supreme Court has said: " '[M]ental injury' is simply another type of 'injury'—like 'physical' and 'pecuniary' injuries—for which the plaintiff could recover in tort upon showing that his injury was proximately and foreseeably caused by the defendant's negligence . . . ." *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 292-93, 395 S.E.2d 85, 90 (1990). The North Carolina Pattern Jury Instructions For Civil Cases, in the footnote to the instruction for Proximate Cause—Peculiar Susceptibility, defines injury as including "all legally recognized forms of personal harm, including activation or reactivation of a disease or aggravation of an existing condition." N.C.P.I., Civ. 102.20. Therefore, the thin skull rule can be applied to mental injury cases, and contrary to Copland's arguments, a defendant may be liable for aggravation or exacerbation of a preexisting mental condition. We find no error in the trial court's instruction defining severe emotional distress.

[3] However, we agree with Copland that where the trial court instructs the jury that severe emotional distress includes exacerbation of a preexisting dissociative disorder, the court must also instruct on peculiar susceptibility. Copland requested an instruction based on N.C.P.I., Civ. 102.20 stating that the jury must find that defendants' negligent conduct, under the same or similar circumstances, could reasonably have been expected to injure a person of ordinary mental condition. The court's failure to give an instruction

POOLE v. COPLAND, INC.

[125 N.C. App. 235 (1997)]

on this issue unfairly prejudiced the defendants, particularly in light of the expert testimony presented.

In this case, Dr. Blake testified he diagnosed Ms. Poole as suffering from a dissociative disorder and posttraumatic stress disorder complicated by depression, with dissociative disorder being the primary diagnosis. Dr. Blake testified that dissociative disorders begin in childhood and are a result of the mind dealing with traumatic experiences by dissociating the memory of the event into separate parts. Then, later in life, an event or series of events cause the parts to come back together and the person reexperiences the traumatic event. As long as the parts are dissociated, the person is not aware of the memory and does not have to face the memory of the traumatic experience unless they suffer an abreaction, commonly know as a "flashback." Dr. Blake testified that almost anything could serve as a triggering event for an abreaction, and gave as an example a Vietnam veteran hearing the sound of a helicopter and suddenly being lost in time back in Vietnam. Dr. Blake further testified sexual harassment at Copland could have triggered an abreaction.

In light of this testimony, the jury could determine that almost any action or event could serve as a triggering event resulting in exacerbation of Ms. Poole's preexisting dissociative disorder. However, in order to be liable for intentional infliction of emotional distress, a defendant's actions, in and of themselves, must be capable of causing and in fact must cause severe emotional distress. *See Dickens*, 302 N.C. at 452, 276 S.E.2d at 335. Therefore, the trial court should have given a peculiar susceptibility proximate cause instruction on the issue of liability requiring the jury to find the alleged conduct could reasonably be expected to injure a person of ordinary mental condition. Because the instructions, as given, would impermissibly allow the jury to find defendants liable for intentional infliction of emotional distress based upon exacerbation of a preexisting dissociative disorder without determining the harassment would injure a person of ordinary susceptibility, Copland is entitled to a new trial.

Copland also argues the trial court erred in giving the pattern jury instruction regarding proximate cause, N.C.P.I, Civ. 202.19, and failing to give Copland's requested instruction. We agree with plaintiff that Copland's proposed instruction was more in the nature of a jury argument. However, as discussed above, the trial court should have given a proximate cause instruction regarding peculiar susceptibility. Such an instruction at a new trial should cover Copland's concerns regarding "but for" causation.

POOLE v. COPLAND, INC.

[125 N.C. App. 235 (1997)]

III.

[4] Lastly, Copland argues the trial court erred in twice instructing the jury on actual damages, separately as to each defendant, and submitting separate actual damages issues to the jury. Copland contends this led to an inconsistent verdict in that the jury awarded different damages amounts against each defendant. Copland also argues the trial court erred by denying Copland's various post-trial motions.

The jury found Copland responsible for both ratification of Haynes' conduct and negligent retention of Haynes. Copland argues that recovery under both theories is purely derivative and that Copland can only be held liable for the damages actually inflicted by Haynes as found by the jury. Under a theory of ratification, just as under a theory of *respondeat superior*, an employer is held vicariously liable for an employee's tortious acts. 27 Am. Jur. 2d, *Employment Relationship* §§ 459 and 460 (1996). When an employer's liability is solely derivative under a theory of vicarious liability, such as *respondeat superior* or ratification, the liability of the employer cannot exceed the liability of the employee. *See* 19 Strong's N.C. Index 4th *Labor and Employment* § 224 (1992); *Pinnix v. Griffin*, 221 N.C. 348, 351, 20 S.E.2d 366, 369 (1942). However, although recovery under a theory of negligent retention of an employee is derivative in the sense that the employee must have committed a tortious act, *see Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 495, 340 S.E.2d 116, 123-24, *disc. review denied*, 317 N.C. 334, 346 S.E.2d 140-41 (1986), the employer's liability is not vicarious, as in *respondeat superior*, but is primary liability based upon the employer's own negligence. David A. Logan and Wayne A. Logan, *North Carolina Torts* § 30.10 (1996); *see also Hogan*, 79 N.C. App. at 495-96, 340 S.E.2d at 124 (negligent hiring and retention is an independent theory of negligence which allows recovery against the employer where no liability would otherwise exist). Because Ms. Poole also sought recovery for the independent negligence of Copland in retaining Haynes, the trial court did not err in submitting separate damages issues for each defendant. However, since the trial court submitted separate damages issues as to each defendant, it should have also submitted separate damages issues to the jury on the issues of ratification and negligent retention by Copland. While Ms. Poole may recover all damages she can prove were proximately caused by Copland's negligent retention of Haynes, her recovery under a theory of ratification is limited to the amount of damages awarded against Haynes. *See Pinnix, supra.*

McMILLIAN v. N.C. FARM BUREAU MUTUAL INS. CO.

[125 N.C. App. 247 (1997)]

Since Haynes has not appealed, the award in favor of Ms. Poole and against Haynes in the amount of $2,000 in actual damages and $5,000 in punitive damages must stand. However, upon a new trial a jury could find, and the jury in the first trial apparently did find, that Ms. Poole was more injured by Copland's negligent failure to take action to stop the harassment than by Haynes' actions. Therefore, if the issues of ratification and negligent retention are both submitted to the jury at the new trial, because the maximum recovery against Copland under a theory of ratification is limited by *res judicata* to the amount awarded against Haynes in the first trial, *see Pinnix*, 221 N.C. 348, 20 S.E.2d 366, the trial court must submit separate damages issues under each theory.

For the reasons stated, defendant Copland is awarded a new trial.

New Trial.

Chief Judge ARNOLD and Judge JOHN concur.